IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

MICHAEL NELSON,                                    03:07-cv-297-MA

           Petitioner,                             OPINION AND ORDER

      v.

JEAN HILL,

           Respondent.


Corinne J. Lai
5895 Jean Road
Lake Oswego, Oregon 97035

      Attorney for Petitioner

John R. Kroger
Attorney General
Jacqueline Kamins
Assistant Attorney General
Department of Justice
1162 Court Street N.E.
Salem, Oregon 97301-4096

      Attorneys for Respondent

MARSH, Judge

      Petitioner, an inmate at Snake River Correctional Institution,

brings this habeas corpus proceeding pursuant to 28 U.S.C. § 2254.

1 -- OPINION AND ORDER

For the reasons set forth below, petitioner's amended petition (#51) is DENIED, and this proceeding is DISMISSED, with prejudice.

**BACKGROUND**

On May 6, 1997, petitioner was indicted on charges that he raped, sodomized, and kidnapped MP (who was 17 at the time of the crime); that he sodomized and kidnapped Jennifer McLeod; and that during the course of these offenses he used and threatened to use a weapon.  Petitioner, and co-defendant Albert Havener, pled not guilty, and a jury trial commenced on January 6, 1998.

At trial, the prosecution presented the testimony of MP, her boyfriend Matt Middleton, her mother Sue Peterson, a Tuality Hospital nurse, several forensic experts, and a corrections deputy. Jennifer McLeod did not appear at trial.

MP testified to her ordeal as follows:  Petitioner is the cousin of MP's ex-boyfriend, and MP had known him for approximately one year.  On the afternoon of April 28, 1997, petitioner arrived at the apartment MP shared with her mother.  Initially, they talked in the living room of the apartment.  MP's mother called home that afternoon, and briefly spoke to petitioner.

Petitioner began to act strange, telling MP that he was in trouble and didn't want to be near the windows.  They eventually went into MP's bedroom to talk.  Petitioner left MP's room and returned with a duffel bag containing a pair of handcuffs. Petitioner and MP wrestled, and petitioner managed to handcuff her

wrists behind her back.  At some point during the altercation, petitioner wrapped duct tape around MP's ankles, and gagged her with a pair of her underwear and duct tape.  Petitioner made a phone call and then returned to MP's room and cut off her clothing with a knife.  Petitioner masturbated over her until he ejaculated. He forced MP at gunpoint to perform oral sex on him, and subsequently raped her.

Shortly thereafter, Albert Havener arrived at the apartment in a pickup truck.  Petitioner draped some clothing and a coat over MP, and forced her to ingest something that was on a thin, multi-colored strip of paper, causing her whole body to feel numb.  She remembers being placed in a truck, being forced to keep her head down, and arriving at a motel.  The next thing she recalls is waking up handcuffed to a toilet in the motel bathroom.

Later that evening, petitioner allowed MP to come into the bedroom of the motel and call her boyfriend Matt Middleton. Petitioner directed her to tell Matt that she was at a friend's house and was fine.  Petitioner then forced MP back into the bathroom, and put a syringe into her mouth containing something that caused her to lose consciousness.  During the course of the evening, petitioner put a second syringe full of liquid in her mouth, shot something into her arm, and made her put another piece of paper in her mouth.  At one point, she awoke to find Havener cutting her waist-length hair.  Throughout the evening she heard

different voices in the motel room and saw two females, one of whom was Jennifer McLeod.  MP testified that she does not know if she was sexually assaulted at the Lamplighter Inn, but stated that she was bleeding vaginally at the motel, and had not been bleeding previously.

At approximately 12:30 the next day, Havener drove MP, petitioner, and Jennifer McLeod to the Jantzen Beach Mall. Petitioner left the van, and Havener subsequently allowed Jennifer McLeod to enter the mall to get some food and use the bathroom. McLeod was found hiding in the bathroom by mall personnel, and the police were notified.

MP's testimony concerning the course of events was corroborated by several witnesses.  Sue Peterson, MP's mother, confirmed that she spoke to petitioner when she called home on the afternoon of April 28, 1997.  Additionally, she testified that when she returned home that evening, the front door was unlocked, the TV and lights were on, and there was a small piece of black cloth on the kitchen floor.

MP's boyfriend, Matt Middleton, testified that he received several calls on the day MP was abducted.  First, at approximately 10:00 p.m., he received a call from MP which originated from the Lamplighter Inn Motel.  Later that evening, he received several additional calls from an unidentified woman instructing him to go to the Shilo Inn the following day; and telling him that they had

MP, that he should tell MP's mother that she is OK, and not to call the police.  Middleton called the Hillsboro police.  The following morning, he went to the Shilo Inn and rented a room.  Middleton testified that, while at the Shilo Inn, he received a telephone call from petitioner directing him to go to a Jantzen Beach gas station.  Middleton advised the Hillsboro police, and went to the gas station.

At the gas station, petitioner told Middleton that MP had been abducted, and that the abductors wanted money for two ounces of "dope."  Middleton refused to pay any money, and again called the police to update them on the situation.  Middleton encountered petitioner a second time at the Jantzen Beach Mall.  Petitioner had a handcuff on one wrist and told Middleton that he also had been kidnapped.

Portland Police Officers Kenneth Whattam and Rob Hansen, and Hillsboro Police Officers Jamie Costro and Allen Zaugg, testified to the events leading up to the arrest of petitioner and Albert Havener.  According to their testimony, they located Jennifer McLeod in a restroom at the Jantzen Beach Mall.  She appeared emotionally distraught.  McLeod eventually led officers to the van in the parking lot where they found MP, visibly shaken and curled up in a ball.  Havener stepped out of the vehicle as officers approached.

According to Officers Costro and Larry Harris, Havener told them that Jennifer McLeod was his girlfriend, and they were "partying" at the Lamplighter Inn when someone decided they wanted money from MP's boyfriend. Havener stated that he picked MP up at her apartment, MP was intoxicated, there were drugs and alcohol at the Lamplighter Inn, he cut MP's hair while she was handcuffed to a toilet, and that although MP wanted to go home, they decided to to make one more attempt to get money from MP's boyfriend.

Petitioner subsequently was arrested in Washington State. Hillsboro Police Detective Robert Crain traveled to Washington to interview petitioner. According to Crain, petitioner admitted that he went to MP's apartment, that he took MP to the Lamplighter Inn, and that he gagged her and handcuffed her to a toilet. Petitioner stated to Officer Crain that he "didn't know it would go this far." However, petitioner denied sexually assaulting MP. When asked if he had sex with Jennifer McLeod, he responded, "is she claiming she was forced?"

Several police officers testified to the seizure of physical evidence from MP's apartment, the Lamplighter Inn Motel, and Havener's pickup truck and van, which corroborated MP's testimony. Officer Harris and Evidence Technician Judy Hall testified that a search of the van resulted in the seizure of methamphetamine, marijuana, LSD (on paper squares), hashish, Vicodin, handcuffs, two guns, two knives, a black shirt with a portion cut out of it

(matching the piece of cloth found in MP's apartment), duct tape with a pair of pantyhose stuffed inside, and a human ponytail. Corporal Zaugg and Evidence Technician Hall further testified that cut and ripped clothing (including a pair of underwear) was found at the Lamplighter Inn.  Hall also testified that a piece of duct tape was found at MP's apartment.

Finally, several individuals testified concerning the forensic evidence.  Registered Nurse Wendy Brewton testified concerning her examination of MP at Tuality Hospital.  Brewton testified that she seized MP's clothing, including a pair of underwear, which she turned over to Corporal Zaugg.  Corporal Zaugg confirmed that he received MP's clothing, including the underwear, which he placed into evidence at the Hillsboro Police Department.  According to Officer Crain, the rape examination of Jennifer McLeod consisted of an *oral* swab only.[1]

Oregon State Police Criminalist Karen Lawless and Dona Scarpone testified to the receipt, and DNA testing, of a pair of white, blood-stained underwear identified as belonging to MP.  Ms. Lawless testified that both blood and sperm were found on the underwear.  Ms. Scarpone conducted the DNA testing on the underwear, and testified that she discovered both a major and minor

---

[1] As noted above, petitioner was not accused of raping Jennifer McLeod.  According to the state record, McLeod accused petitioner of forcing her to perform oral sex on him.  See Resp. Exh. 102; 12/15/97 Omnibus Hrg. TR at 38; Resp. Exh. 122 at 5.

type of DNA.  The major DNA type was consistent with coming from petitioner.  Ms. Scarpone testified that the results were inconclusive as to whether MP was the donor of the minor type of DNA.  A blood draw and urine sample also were taken from MP, showing no signs of drugs in her system.  However, an expert testified that the blood results did not rule out the possibility that she had drugs in her system 12-18 hours earlier.  Several pictures of MP's arms were offered as evidence of puncture wounds.

Finally, Officer Haugg and Evidence Technician Hall were questioned by the defense regarding a blue light examination of MP's bedroom conducted to locate dried bodily fluids.  According to Hall, there was evidence of bodily fluids on the floor, a pair of jeans, and a comforter.  However, no evidence was presented linking petitioner to those fluids.  Petitioner did not testify in his defense.

Petitioner was convicted of Rape in the First Degree, Sodomy in the First Degree, Kidnapping in the First Degree (2 counts), and Unlawful Use of a Weapon (all relating to MP).  The trial court granted the defense's motion for judgment of acquittal on all offenses concerning Jennifer McLeod.  Petitioner was sentenced to 350 months imprisonment.  Petitioner filed a direct appeal challenging the trial court's denial of his motion to suppress and the constitutionality of his Measure 11 mandatory minimum sentences.  The Oregon Court of Appeals affirmed from the bench,

and the Oregon Supreme Court denied review.  State v. Nelson, 170 Or. App. 159, 10 P.3d 335 (2000), rev. denied, 331 Or. 692 (2001).

Petitioner sought state post-conviction relief, raising ineffective assistance of counsel and due process claims.  The post-conviction court denied relief, the Oregon Court of Appeals affirmed without opinion, and the Oregon Supreme Court denied review.  Nelson v. Lampert, 207 Or. App. 435, 142 P.3d 125 (2006), rev. denied, 342 Or. 299 (2007).

## DISCUSSION

## I. Timeliness.

Pursuant to 28 U.S.C. § 2244(d)(1), a one-year period of limitation applies to an application for a writ of habeas corpus filed "by a person in custody pursuant to the judgment of a State court."  It is uncontested that petitioner's original habeas corpus petition (#3), was timely filed on or about February 20, 2007. However, the allegations contained in petitioner's amended petition (#51), filed over two years later, are timely only if they relate back to the filing of the original petition.  Respondent argues that Ground for Relief One, subparts (A)(1)(e), (A)(1)(f) (in part), (A)(1)(g), (A)(2), (A)(4), and all of Ground for Relief Two (except the claim that the prosecutor committed a Brady violation) do not relate back.  Petitioner responds that the new grounds simply clarify what he attempted to set out in his *pro se* habeas petition.

9 -- OPINION AND ORDER

"[A] new claim in an amended petition relates back to avoid a limitations bar, when the limitations period has run in the meantime, only when it arises from the same core of operative facts as a claim contained in the original petition." Hebner v. McGrath, 543 F.3d 1133, 1134 & 1138 (9th Cir. 2008); Mayle v. Felix, 545 U.S. 644, 659 (2005).  A new claim supported by facts that differ in both "time and type" from those in the original pleading, does not relate back.  Mayle, 545 U.S. at 650.

In petitioner's original petition, he alleged seven grounds of ineffective assistance of counsel that pertained to the manner in which DNA evidence was investigated, handled, disclosed, and presented at trial; and counsel's failure to offer evidence of MP's pregnancy and abortion as a motive for falsely accusing petitioner of rape.  Additionally, petitioner alleged two due process claims arising out of the prosecution's alleged failure to disclose the rape examination results and DNA evidence.

The following grounds, added in the amended petition, are separated in "time and type" from the allegations of the original petition and, therefore, do not relate back to the filing of the original petition:

**Ground 1(A)(1)(e)** - Trial counsel was ineffective for failing to produce at trial *expert testimony* concerning the forensic testing.

**Ground 1(A)(1)(g)** - Trial counsel was ineffective for failing to discover, investigate, and otherwise produce at trial evidence that the alleged victim's adult boyfriend owned and operated a

pornography web site, was a drug addict, and owed petitioner a large sum of money.

**Ground 1(A)(2)** - Trial counsel *failed to request a judgment of acquittal or mistrial* at the close of the State's case-in-chief due to the prosecution's failure to properly admit the forensic results and introduce the evidence that was the subject of the test results.

**Ground 1(A)(4)** - Trial counsel *failed to object* to the testimony of the prosecution witnesses concerning the physical evidence and testing thereof, comments by the prosecutor and prosecution witnesses that implied that petitioner's DNA was found at the victim's home; and failed to independently test the DNA evidence.

**Ground 2(B)-(D)** - Due process rights were violated by the prosecution's *introduction of DNA evidence* (without introducing at trial the physical evidence from which the DNA was drawn), and by the prosecution's *introduction of DNA evidence* that did not belong to the alleged victim. The trial court *improperly admitted* the DNA evidence.

Accordingly, all of the foregoing grounds for relief are denied on the basis that they are time barred. 28 U.S.C. § 2244(d)(1). However, I conclude that Ground 1, subpart (A)(1)(f) arises out of the same core of operative facts as Ground for Relief 7 in the original habeas petition. That ground, therefore, relates back to the filing of the original petition and is timely.

**II.   Procedural Default.**

Generally, a state prisoner must exhaust all available state court remedies either on direct appeal or through collateral proceedings before a federal court may consider granting habeas corpus relief. 28 U.S.C. § 2254(b)(1). A state prisoner satisfies the exhaustion requirement by *fairly presenting* his claim to the

appropriate state courts at all appellate stages afforded under state law. Baldwin v. Reese, 541 U.S. 27, 29 (2004); Casey v. Moore, 386 F.3d 896, 915-16 & n.18 (9th Cir. 2004). Fair presentation requires that discrete claims of ineffective assistance of counsel be individually exhausted. Moormann v. Schriro, 426 F.3d 1044, 1056 (9th Cir. 2005). A claim is not "fairly presented" if it is presented in a procedural context in which the merits will not be considered absent special circumstances. Castille v. Peoples, 489 U.S. 346, 351 (1989).

Respondent contends that the *only* grounds that were fairly presented to the state courts are Ground One, subparts (A)(1)(a), (b) & (d), and Ground One, subpart (A)(3). Respondent argues that all other grounds are procedurally defaulted because (1) petitioner failed to raise the remaining claims of ineffective assistance of counsel to the Oregon Court of Appeals and Supreme Court; and (2) petitioner failed to raise the claims of prosecutorial misconduct and trial court error on direct appeal.

Having reviewed petitioner's second amended petition for post-conviction relief, his counseled appellate brief and petition for review, and his *pro se* supplemental appellate briefing, I agree that only Ground One, subparts (A)(1)(a), (b), & (d); and Ground One, subpart (A)(3) were fully exhausted in state court. The remaining grounds were procedurally defaulted as follows:

Ground One, subparts (A)(1)(c), (e), (g), (A)(2), and (A)(4),[2] and Ground One, subpart (B), are discrete claims of ineffective assistance of counsel that were not fairly presented on appeal from the denial of post-conviction relief in either petitioner's counseled briefs or his *pro se* supplemental briefs. Ground One, subpart (A)(1)(f), in contrast, was raised in petitioner's *pro se* supplemental appellate briefs, but was not initially raised in his Second Amended Petition for Post-Conviction Relief. Accordingly, Ground 1, subpart (A)(1)(f) was presented in a procedural context in which it would be not considered and is procedurally defaulted. See Ore. R. Civ. P. 5.45(1) (no matter claimed as error will be considered on appeal unless it was preserved in the lower court except errors of law apparent on the record); see also Moore v. Mills, 2010 WL 3656061 *3 (D.Or. 2010) (presentation of a claim on appeal as plain error is not fair presentation for exhaustion purposes).

Ground Two, subparts (A)-(D) are due process claims, alleging prosecutorial misconduct and trial court error, which could have been raised at trial and on direct appeal, but were not.

---

[2] Arguably, Ground One, subpart (4)(a) (counsel's failure to object to *testimony* of prosecution witnesses concerning the physical evidence and DNA testing) is similar to the second assignment of error raised in petitioner's *pro se* supplemental appellant's brief and petition for review (counsel's failure to object to the admission of DNA test results). However, even assuming that this ground was fairly presented, it is time barred as set forth above.

Consequently, to the extent they were raised by petitioner in his second amended petition for post-conviction relief, and on appeal from the denial of post-conviction relief, the grounds were raised in a procedural context in which they would not be considered. See Palmer v. Oregon, 318 Or. 352, 356-58, 867 P.2d 1368 (1994); see also Pinnell v. Belleque, 638 F.Supp.2d 1231, 1240 (D.Or. 2009) (opining that Oregon law would not preclude prosecutorial misconduct claim, *which could not have been raised at trial or on direct appeal*, from being raised in state post-conviction proceeding); Allee v. Morrow, 2004 WL 1375536 (D.Or. 2004) (prosecutorial misconduct claim that could have been raised on direct appeal was procedurally defaulted due to petitioner's failure to do so); Farrar v. Thompson, 2001 WL 34727918 (D.Or. 2001) (same).[3]

Petitioner makes no showing of cause and prejudice to excuse his procedural default, nor has he demonstrated that failure to consider the grounds will result in a fundamental miscarriage of justice. See Coleman v. Thompson, 501 U.S. 722, 750 (1991). Hence, habeas relief is precluded as to Ground 1, subparts (A)(1)(c),(e),(f) & (g); Ground 1, subpart (A)(2), Ground 1,

---

[3] To the extent that petitioner now seeks to characterize these grounds as a denial of the right to confront witnesses, the court declines to allow any such amendment of the petition. See Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994) (traverse is not proper pleading to raise additional grounds).

subpart (A)(4), Ground 1, subpart (B); and Ground 2, subparts (A)-(D).

**III. <u>The Merits</u>.**

  In his remaining grounds for relief, petitioner alleges as follows:

Ground 1: Ineffective assistance of trial counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution in the following respects:

   A. Trial counsel failed to adequately investigate the facts and circumstances underlying the charges, including, but not limited to the following:

     1. Trial counsel failed to ascertain, discover, investigate, and otherwise produce at trial:

       (a) Evidence that the physical evidence that was the subject of the DNA forensic testing did not belong to the alleged victim;

       (b) Evidence that the bodily fluids found in the alleged victim's home did not belong to the petitioner;

         * * * * *

       (d) The results of the alleged victim's rape examination (testimony of experts and reports themselves);

         * * * * *

     3. Trial counsel failed to challenge the chain of custody of the physical evidence that was the subject of the forensic testing (DNA).

Amended Petition at 10-11.

Pursuant to 28 U.S.C. § 2254(d), habeas relief may not be granted unless it is shown that the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts in light of the record before the state court.   Harrington v. Richter, 131 S.Ct. 770, 785 (2011). "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 131 S.Ct. 1388, 1398-99 (2011).

"'The benchmark for judging any claim of ineffectiveness [is] whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" Id. at 1403 (quoting Strickland v. Washington, 466 U.S. 668, 686 (1987)).   Under Strickland, counsel is strongly presumed to have rendered adequate assistance and to have made all significant decisions in the exercise of reasonable professional judgment.   Cullen, 131 S.Ct. at 1403 (citing Strickland, 466 U.S. at 690); Richter, 131 S.Ct. at 787.

Hence, a claim of ineffective assistance of counsel requires petitioner to prove that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.   Premo v.

<u>Moore</u>, 131 S.Ct. 733, 739 (2011); <u>Williams v. Taylor</u>, 529 U.S. 362, 390-91 (2000); <u>Strickland</u>, 466 U.S. at 687-88.

To prove deficiency of performance, petitioner must show that counsel's representation fell below an objective standard of reasonableness. <u>Richter</u>, 131 S.Ct. at 787; <u>Taylor</u>, 529 U.S. at 390-91; <u>Strickland</u>, 466 U.S. at 688. To establish prejudice, petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. <u>Richter</u>, 131 S.Ct. at 787; <u>Taylor</u>, 529 U.S. at 391; <u>Cullen</u>, 131 S.Ct. at 1403. In evaluating proof of prejudice, this court considers the totality of the evidence before the jury. <u>Strickland</u>, 466 U.S. at 696.

The determination of whether a state court's application of the <u>Strickland</u> standard was unreasonable, so as to warrant habeas relief under 28 U.S.C. § 2254(d), is "doubly" deferential, requiring petitioner to prove that there is no reasonable argument that counsel satisfied <u>Strickland's</u> deferential standard. <u>Premo</u>, 131 S.Ct. at 740; <u>Richter</u>, 131 S.Ct. at 788.

**A.    <u>Ground for Relief 1, Subparts A(1)(a) & A(3)</u>.**

Petitioner alleges that trial counsel failed to (1) ascertain, discover, investigate, and otherwise produce at trial evidence that the physical evidence that was the subject of the DNA forensic testing did not belong to MP; and (2) challenge the chain of custody of the physical evidence that was the subject of the

forensic testing (DNA). Both of these grounds pertain to the
white, blood-stained underwear that was the subject of DNA testing.
In his supporting brief, petitioner argues:

> Counsel did not view or have any idea what evidence
> was gathered by the state. Had counsel viewed the
> evidence pretrial, she would have been able to raise
> reasonable doubt as to the ownership of the panties. The
> panties were size M-6, undamaged, and a size consistent
> with McLeod. Counsel would have discovered another dark
> pair of panties collected that were sized XL-8, appeared
> to be cut off, and a size consistent with [MP]. No
> testing was done on the dark XL-8 panties. However, the
> white M-6 panties, if they belonged to McLeod and have
> DNA consistent with Nelson's, would have been entirely
> consistent with his pretrial statement of consensual
> sexual contact with McLeod but not [MP]. And the dark
> panties, if [MP's], would have been more consistent with
> [MP's] claim of having her clothes cut off her. Counsel
> did not know whether menstrual blood on the white panty
> was reasonable if the panty belonged to [MP] in view of
> [MP's] pregnancy. Counsel was not able to make the
> connections during trial because she had not conducted a
> viewing of the evidence collected by the state to know
> two (2) underpants had been collected, did not know the
> size of [MP's] or McLeod's underwear, did not perform an
> investigation to determine what sizes, if any, were worn
> by whom, and did not know to whom the dark panties
> belong.

Pet. Memo. at 27.

Petitioner's argument is the very type of "intrusive post-
trial inquiry" that the Supreme Court counsels against. See
Strickland, 466 U.S. at 690. Despite the intricacy of the
argument, petitioner points to no evidence that trial counsel could
have discovered, and offered at trial, to establish that the white
underwear seized by hospital personnel, and turned over to police,

18 -- OPINION AND ORDER

were not worn by MP on the day she was found at the Jantzen Beach Mall.

Further, petitioner offers no evidence demonstrating that there was a break in the chain of custody of the underwear that could have been proven at trial.  As set forth above, Nurse Brewton testified that she seized a pair of underwear from MP at Tuality Hospital when she conducted the rape examination.  She testified that she turned the underwear over to Corporal Zaugg, who testified that he put them into evidence at the police department.  Evidence Technician Hall similarly testified that she received the underwear from the rape examination of MP.  Criminalist Karen Lawless, in turn, testified that she received the underwear from the police department for DNA testing.  At her request, the DNA testing was done by Dona Scarpone.

Moreover, there is no evidence in the record that hospital staff seized underwear worn by Ms. McLeod, nor any allegations that petitioner engaged in conduct which would cause his DNA to be on underwear worn by McLeod.  Officer Crain testified that Jennifer McLeod's rape examination consisted only of an oral swab. Petitioner's conjecture that the size of the white underwear (M-6), in contrast to the ripped, dark pair of underwear in evidence (size

XL-8), supports the conclusion that the white underwear belonged to Jennifer McLeod, is speculative at best.[4]

In sum, given the totality of the testimonial and physical evidence, including the compelling testimony of MP, petitioner has failed to demonstrate that there is a reasonable probability that, but for trial counsel's failure to challenge the chain of custody of the underwear, or otherwise cause the jury to question whether the white underwear belonged to MP, the results of the trial would have been different. Accordingly, petitioner has failed to demonstrate that the state court's rejection of this ineffective assistance of counsel claim is contrary to, or an unreasonable application of, clearly established federal law; or was based upon an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(1) & (2).

B.    **Ground 1, Subpart A(1)(b).**

According to the testimony at trial, a "blue light" process was used by police to locate any bodily fluids in MP's bedroom. Petitioner alleges that trial counsel was ineffective for failing to ascertain, discover, investigate and otherwise produce at trial evidence that the bodily fluids found in MP's bedroom did not

---

[4] It is worthy of note, that defense counsel objected to Ms. Lawless' testimony concerning the underwear, on the basis that the underwear was not in evidence. That objection was overruled by the trial court. Trial TR at 465.

belong to petitioner.  This grounds fails under both prongs of the

<u>Strickland</u> analysis.

Defense counsel's closing argument addressed the State's

failure to link petitioner to any of the bodily fluids located in

MP's bedroom:

> Item No. 6, the blue light and the blue jeans, which you've heard a little bit about.  If you believe [MP], when Mr. Nelson masturbated, the semen was ejaculated and came out and was on her.  She said she thought it landed on her.  Excuse me.  Corporal Zaugg testified that there was something on some blue jeans and he took that to the crime lab or that that was taken to the crime lab.  I'm not sure that he took it.

> Ladies and gentlemen, where are the results.  You heard no testimony from the crime lab that anything found on any blue jeans belonged to Mr. Michael Nelson, nothing, because it didn't, because there wasn't anything there, because there was nothing to testify about, ladies and gentlemen, except that it did not belong to Michael Nelson.

Trial TR at 775-76.

In light of the substantial evidence pointing to petitioner's

guilt, an attorney reasonably could decide to forgo further inquiry

into the bodily fluid evidence in favor of arguing that the

prosecution had failed to prove its case, beyond a reasonable

doubt, by failing to link petitioner's DNA to MP's bedroom.  <u>See</u>

<u>Richter</u>, 131 S.Ct. at 789-90 (competent attorney may opt not to

pursue discovery he reasonably believes may be harmful to the

defense). As the Supreme Court has repeatedly noted, "Rare are the

situations in which the wide latitude counsel must have in making

tactical decisions will be limited to any one technique or approach." Id. at 789 (internal quotations omitted); Cullen, 131 S.Ct. at 1407.

Moreover, petitioner offers no evidence that the bodily fluids have since been tested and exclude petitioner as a possible donor. Hence, petitioner fails to demonstrate that, but for counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. The state court's rejection of this ground is neither contrary to, nor an unreasonable application of, clearly established federal law. Nor is it based upon an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(1) & (2).

C.    **Ground 1, Subpart A(1)(d).**

Petitioner alleges that trial counsel was ineffective for failing to ascertain, discover, investigate and otherwise produce at trial evidence of the results of MP's rape examination kit. Petitioner's argument is twofold. First, petitioner argues that because trial counsel "did not know the [rape] kit results, she did not know [MP's] alcohol and drug test results came back negative." Pet.'s Supporting Brief at 26. In this regard, petitioner argues that "[c]ounsel could not, and did not, rebut the claim [MP] had been heavily drugged the entire time." Id. Additionally, petitioner argues that defense counsel failed to rebut the allegations of rape and sodomy with evidence that [MP's] rape

examination kit revealed no signs of semen.  <u>See</u> Resp. Exh. 125. ER-18; Pet.'s Exh. 7.

- **Blood and Urine Test Results.**

A review of the state record reveals that defense counsel was aware that blood and urine draws were done at the Tuality Hospital. At a pretrial hearing held on December 15, 1997, defense counsel indicated her knowledge that a blood draw had been performed.  <u>See</u> 12/15/97 Omnibus Hearing TR at 37.  At that same hearing, the prosecution advised the court and defense counsel that no drugs or alcohol were detected in the blood screening.  <u>Id.</u>  The prosecution further indicated that the crime lab report on the blood draw was given to defense counsel.  <u>Id.</u> at 38-39.

At trial, the prosecution offered testimony in its case in chief that MP's blood test was negative for any alcohol or drugs, but that this did not rule out the possibility that they could have been in her system 12-18 hours earlier.  Defense counsel, in turn, offered evidence that MP's urine test, conducted by hospital staff, similarly showed no signs of drugs.  In closing, defense counsel argued that the absence of drugs in MP's system should cause the jury to discredit her entire testimony:

> The urine, ladies and gentlemen – and there's been a lot of testimony about this.  The State would have you believe that [MP] was injected with drugs.  The testimony regarding possible drugs was that there was LSD at the house.  That was something that [MP] described as a "fry."  She told you that she had seen it before and she said it was acid or LSD.  By all rights, it appears that

23 -- OPINION AND ORDER

that, if you believe [MP], that that was taken between 5:00 and 6:00 p.m. on April 28th.

Then at the Lamplighter, if you believe [MP], after she had been there a while, something was squirted in her mouth. I think it's fair to assume that would be about 9:00 or 10:00. Then in the nighttime, she says she took something else on paper. And then the fourth and last time, she was taken into the bedroom in the motel and a needle was put in her arm, and I think it's fair to assume that's about five o'clock. I believe she testified that it was shortly after she was taken out.

There is a blood draw and there is a urine draw about 12 hours later at Tuality Hospital. We're not really sure exactly what time the blood was drawn, although we do know what time it was tested. And, ladies and gentlemen, there's nothing there, nothing in the blood tests that the crime lab did, nothing in the urine tests that the hospital did. Granted, the hospital is not a forensic institute. The hospital is in the business of treating people, and those drug screens that they test urine with are used by physicians in the course of treating people, so they are reliable.

No drugs, ladies and gentlemen. Who do you believe? That something was attempted to be administered to [MP]? Or do you believe the tests that show absolutely nothing? I suggest that the testimony regarding what she was administered was not true, because the tests, the impartial scientific tests, show there were no drugs. And if you don't believe that, ladies and gentlemen, her entire testimony is called into question.

Trial TR at 774-75.

In sum, the state court record does not support petitioner's assertion that trial counsel was not aware that a blood and urine draw were taken. Accordingly, petitioner has failed to demonstrate that trial counsel performed deficiently due to her failure to ascertain, discover, investigate or otherwise produce at trial the

results of the blood and urine tests conducted at the Tuality Hospital.

- **Test Results Showing an Absence of Semen**.

Petitioner further alleges that defense counsel was unaware of the serology test results indicating that no semen was detected on several vaginal, cervical, and oral swabs taken from MP. See Resp. Exh. 125, ER-18. Petitioner argues that this resulted in counsel's failure to present important exonerating evidence to the jury.

However, defense counsel expressed her knowledge of the test results in an affidavit submitted to the post-conviction court. Resp. Exh. 120 at 5. Admittedly, zealous counsel might have questioned Criminalist Karen Lawless about the serology results so as to bring the negative results to the jury's attention. However, assuming that this failure constitutes deficient performance, petitioner has failed to demonstrate that there is a reasonable probability that, but for counsel's failure, the result of the proceeding would have been different. This conclusion is compelled by the fact that MP testified to the sexual assault, the physical evidence confirmed MP's account of being gagged at her apartment and having her clothes cut off by petitioner, and the prosecution presented DNA evidence that petitioner's semen was found on MP's blood-stained underwear.

Accordingly, I conclude that the state court's rejection of this ground is neither contrary to, nor an unreasonable application

of, clearly established federal law. Nor is it based upon an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(1) & (2).

### CONCLUSION

Based on the foregoing, petitioner's amended habeas corpus petition (#51) is DENIED, and this proceeding is DISMISSED with prejudice. Because petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability is DENIED. See 28 U.S.C. § 2253(c)(2).

IT IS SO ORDERED.

DATED this _21st___ day of February, 2012.


_/s/ Malcolm F. Marsh___
Malcolm F. Marsh
United States District Judge